[No. C014083. Third Dist. June 9, 1993.]

MANUEL ROSAS, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CITY OF
STOCKTON, Respondents.

[No. C014491. Third Dist. June 9, 1993.]

BOEHM & ASSOCIATES et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD, CITY OF
STOCKTON, et al., Respondents.

COUNSEL

Boxer, Elkind & Gerson and Barry J. Williams for Petitioner in No. C014083 and for Respondents in No. C014491.

Steven Tanenbaum for Petitioners in No. C014491.

Thomas McBirnie, Hanna, Brophy, MacLean, McAleer & Jensen and George W. Hatfield for Respondents in Nos. C014083 and C014491.

OPINION

PUGLIA, P. J.—In consolidated petitions for writ of review, the petitioners challenge the denial of workers' compensation benefits for a waste water treatment worker who contracted hepatitis B. We have concluded substantial evidence does not support the decision of the respondent, Workers' Compensation Appeals Board (Board), denying reconsideration of the order denying benefits. We shall therefore annul the Board's decision.

I

Petitioner Manuel Rosas (Rosas) filed an application for adjudication of his claim for workers' compensation benefits on December 17, 1987, alleging he suffered injury to his back, leg and internal organs when exposed to sewage on September 4, 1987, while employed as an instrument repair technician with real party in interest, the City of Stockton (City), permissibly self-insured. Subsequently, Rosas amended his application to allege he sustained injury to his internal organs, legs, arms and multiple parts of his body from exposure to hepatitis from raw sewage during the period from

September 4, 1986, to September 4, 1987. The City answered the application, denying Rosas suffered injury arising out of or in the course of his employment and denying liability for workers' compensation benefits.[1]

Rosas was the sole witness at the initial hearing before the Board's workers' compensation judge (WCJ) on April 16, 1990. Rosas testified without contradiction. He worked for the City for approximately eight years before his injury. He installed, inspected, maintained and repaired flow regulators, recording and transmitter instruments, controlling apparatus, display equipment and other systems used in waste water treatment substations located throughout the city. His job responsibilities periodically required him to reach his hands into raw sewage to remove equipment for repair. Although Rosas wore gloves, sometimes the equipment would cut his gloves, exposing his hands to raw sewage, or the sewage would flow over the tops of the gloves. At times, his hands would be nicked and he would bleed. Rosas estimated he was exposed to raw sewage two or three times per week, including the time period prior to September 4, 1987. Some of the City's sewer substations lacked facilities to wash after exposure to the sewage.

The parties submitted into evidence medical records and reports of Rosas's treating and examining physicians. Dr. Del Paine reported that laboratory tests administered when Rosas received treatment at an emergency room on September 8, 1987, showed Rosas had contracted hepatitis B. Dr. Rishwain, a gastroenterologist, examined Rosas in November 1987. Rishwain reported that although Rosas's symptoms associated with acute hepatitis B had begun to improve, Rosas began to experience weakness in his hands and feet approximately one month after the onset of the hepatitis B. In August 1989, Rishwain reported Rosas had developed chronic hepatitis B and, "in association with his type B hepatitis, he developed polyarteritis nodosa with significant neurologic deficits involving the use of his hands and legs."

The parties deposed Dr. Rishwain regarding causation of the hepatitis B and polyarteritis nodosa (PAN). Rishwain testified Rosas could not have been a chronic carrier of hepatitis B but rather must have contracted the disease within six months before Rishwain first saw Rosas because Rosas had never prior to September 1987 exhibited symptoms of hepatitis B and

---

[1]Petitioner Boehm & Associates (Boehm) filed several requests and amended requests for allowance of liens on behalf of lien claimants Operating Engineers Trust Fund, Standard Insurance Company and St. Joseph's Hospital. Following the Board's order denying reconsideration, Boehm filed a separate petition for writ of review of that decision on behalf of the lien claimants. Boehm raises essentially the same arguments as those raised by Rosas. On our own motion, we consolidated Boehm's petition with Rosas's petition.

because Rosas's "hepatitis B core antibody I[g]M blood test" was positive on October 30, 1987. Rishwain explained the positive immunoglobulin macro (IgM) blood test indicated Rosas developed PAN as a complication of acute hepatitis B. However, Rishwain testified he lacked sufficient information to know whether a person can contract hepatitis B from exposure to raw sewage, and would defer that question to an occupational health specialist.

Dr. Gandara, a diplomate of the American Board of Internal Medicine, examined Rosas in June 1988. Gandara reported Rosas has no risk factors for hepatitis B, such as intravenous drug use, homosexuality, foreign travel or hepatitis in family or friends. However, Rosas was required to place his gloved hands into raw sewage which often came into contact with his skin through leaks in the gloves or, from time to time, by flowing over the tops of the gloves; also, Rosas sometimes smoked cigarettes after working in the sewage without first washing his hands. Gandara reported: "Most commonly, hepatitis B is spread through either perinatal, exposure to infected blood or blood products, puncture of the skin with contaminated needles or instruments, and close personal contact, particularly sexual contact. However, hepatitis B has also been spread through household contacts of hepatitis B carriers, without the above mechanisms being implicated, and also in international travelers visiting endemic areas of hepatitis B infection. Studies such as those by Reiner, Bernier, and Blainey, have reported hepatitis B surface antigen in feces and urine of carriers of this disease [citations]. Presumably, a break in the mucosa of a sewer worker such as Mr. Rosas could then be implicated in the development of this disease. [¶] As described above, Mr. Rosas has none of the other pre-disposing factors for this condition. Therefore, based on the information available, I would consider his hepatitis to be most likely and medically probably occupationally-related. Since [PAN] is a known complication of hepatitis B infection, this disorder should also be considered occupationally-related in this case."

Dr. Gandara reexamined Rosas in February 1989. Gandara reported Rosas's condition had developed into chronic hepatitis and Rosas remained severely disabled from PAN. In subsequent reports, Gandara reasserted that PAN was a complication of hepatitis B. Gandara argued the suggestion that Rosas's hepatitis B might have developed as a complication of PAN was inconsistent with the medical findings in Rosas's case and with accepted medical literature. Gandara also cited a number of medical studies in support of his opinion that hepatitis B may be spread by exposure to human waste, such as blood, saliva, urine, semen, vaginal secretions and perhaps feces, although Gandara conceded that he was unaware of studies showing exposure of hepatitis B to sewage treatment workers. Gandara examined Rosas a third time, in February 1990. Gandara reported that although Rosas had

improved somewhat, Rosas continued to require ankle braces to support himself while walking and continued to have difficulty with fine motor coordination of his hands. In a supplemental report in January 1991, Gandara cited medical studies in support of his view that Rosas's PAN developed as a complication of hepatitis B.

Rosas also submitted the medical reports of Dr. Chu, a board certified physiatrist, who examined Rosas in March and April 1990. Chu opined that Rosas's hepatitis B and PAN are probably work-related.

The City relied on the medical reports of Dr. Ogrod, an internist, who examined Rosas in January 1989. Ogrod indicated that, although Rosas has the "hepatitis B surface antigen," it is impossible to determine whether Rosas developed an acute case of hepatitis B in September 1987 rather than a recurrence of preexisting chronic hepatitis B because no hepatitis B core antigen IgM blood test was conducted in October 1987 but rather a combined immunoglobulin (IgG) and IgM test; Ogrod opined that, had an IgM blood test been positive in October 1987, in all probability it would mean Rosas had an acute hepatitis B infection and was not a hepatitis B carrier. As to the relationship between PAN and hepatitis B, Ogrod opined that many patients develop PAN independently of hepatitis, many other patients with hepatitis B never develop PAN and medical science is unsure which causes the other. Ogrod concluded that, given the lack of a positive IgM antigen test, Rosas's entire syndrome can be explained as a patient with PAN who also happens to be a chronic hepatitis carrier.

As to the relationship between Rosas's employment and his development of hepatitis B, Dr. Ogrod reported that Rosas had one episode in early September when raw sewage splashed on his face, but the onset of symptoms was very soon thereafter; because the laboratory tests are consistent with a hepatitis that had been present for several weeks, the exposure to raw sewage was irrelevant. Ogrod further indicated that, although hepatitis B can be contracted by exposure to small amounts of bodily fluids and solids, particularly blood, semen, urine, feces and other secretions, the amounts of the virus shed in urine and feces are not sufficient for hepatitis B to spread through sewage, and outbreaks of hepatitis A but not B have occurred after contamination of water supplies with sewage.

In a supplemental report, Dr. Ogrod clarified an error in the typing of page 7 of his previous report: "The opening sentence suggests that [PAN] was a cause of hepatitis B, and that's not accurate at all. The sentence should have read that [PAN] may be caused by hepatitis B. In other words, the hepatitis virus or the existence of the antigen in the blood stream may play a role in

precipitating [PAN]." However, Ogrod reiterated his view that all of Rosas's symptoms may be explained by a diagnosis of PAN alone, and further that because 70 percent of PAN cases are not associated with hepatitis B, and of the other 30 percent most patients are hepatitis carriers, the hepatitis B might not be a contributing cause of PAN.

Dr. Ogrod also repeated his understanding that Rosas's exposure to sewage was minimal (Rosas was "not the type of sewage worker who is at a sewage plant who is sort of, if you will, sloshing around in the stuff all day long"). Ogrod further opined that although the hepatitis B virus can survive in bodily fluids and solids, it does not seem to survive in sufficient quantities to be transmitted via sewage; Ogrod based this opinion on the lack of current literature defining "occupational activities of this nature as being a risk with respect to this virus in this country . . . . It's not the presence or absence of virus in body fluids or even being shed in the GI tract or found in feces; it's rather whether or not the specific mode has reasonably been shown to cause infection." Ogrod concluded: "So we have two [sic] problems in assuming with ease that this patient has an occupational illness. First, the initial data in this patient may not have accurately characterized the existence or absence of true hepatitis B; he could be a carrier. Second, the patient's entire illness is explainable on the basis of [PAN], even in the absence of hepatitis B. Third, the patient does not have a reasonable occupational mechanism for the acquisition of this particular kind of hepatitis."

After the hearing on April 16, 1990, and faced with the conflicting medical reports, the WCJ continued the hearing and ordered the appointment of an independent medical examiner, Dr. Whorton. Whorton, board certified in internal, preventive and occupational medicines and a fellow in the American College of Epidemiology, filed his report on October 31, 1990, after examining Rosas in July 1990. Whorton noted that the Center for Disease Control (CDC) has issued guidelines for protection against hepatitis B, which do not list municipal sewage workers among at-risk groups. Whorton concluded: "Looking backward over the past three years of Mr. Rosas' medical condition, the most likely diagnosis is [PAN] with the accompanying hepatitis B antigenicity (seen in 30% of cases). This diagnosis unifies all of the findings into a single condition. Otherwise, one must have two conditions occurring and becoming symptomatic simultaneously. While this could occur, it is less likely. . . . [¶] With either diagnosis ([PAN] or hepatitis B infection), there is no scientific method to relate either to Mr. Rosas's occupation other than speculation."

Rosas cross-examined Dr. Whorton at deposition on December 17, 1990. Whorton testified that among the 30 percent of people who have PAN and

also test positively for hepatitis B, the PAN is not necessarily caused by the hepatitis. Whorton opined that Rosas, at some time in his life, had been exposed to hepatitis B and as a result developed the hepatitis antigen, but suggested Rosas could have been a carrier who was exposed to hepatitis B years earlier. Whorton conceded that, because none of the other methods for contracting hepatitis B applied to Rosas, it is "potentially possible" Rosas contracted hepatitis B from exposure to raw sewage. But, because in 50 percent of the cases the etiology of hepatitis B is unknown, and given that the CDC guidelines do not expressly list municipal sewage workers at high risk, Whorton stood by his opinion that Rosas did not contract hepatitis B from his exposure to sewage. However, Whorton admitted the CDC guidelines indicate that health care and public safety workers who come in contact with blood or blood-contaminated bodily fluids should be vaccinated for hepatitis B. Whorton also acknowledged that blood enters the sewer system, as do urine, semen and other human wastes in which the hepatitis B virus can survive, including perhaps feces. Moreover, Whorton testified the fact Rosas was sometimes unable to wash after contact with sewage might provide another means for contracting hepatitis B. Whorton then testified that if he thought sewage workers came into contact with blood and blood-contaminated fluids he would change his opinion to conclude that it was more likely than not that Rosas contracted hepatitis B from sewage. Finally, Whorton testified the opinion stated in his report had not changed.

By order of the WCJ, the deposition of Dr. Whorton continued on August 2, 1991. Whorton explained that since his previous deposition he had reviewed Dr. Rishwain's deposition testimony and, accordingly, had changed his opinion regarding the causal relationship between PAN and hepatitis B; Whorton accepted Rishwain's opinion that Rosas developed PAN as a complication of hepatitis B. However, Whorton adhered to his opinion that Rosas did not contract hepatitis B from occupational exposure to raw sewage. Whorton testified his opinion was based in part on a medical article regarding health risks for waste treatment plant workers; Whorton spoke with the author of the article who said he had never read reports of waste treatment workers contracting hepatitis B. Whorton also testified without objection he had an assistant contact Dr. Lewis Polish at the CDC's hepatitis branch, who said sewage treatment workers are not included in the CDC guidelines because hepatitis B is not a risk for such workers.

Whorton testified, however, based on his familiarity with the organization of sewage treatment plants and on his discussions with Rosas, it is reasonable to assume Rosas worked in substations located in close proximity to the sources of sewage. Whorton explained the hepatitis B virus loses vitality outside the warm temperature of a human body but can survive "minutes or

hours" at room temperature and even longer in higher temperatures. He further agreed raw sewage can contain viable hepatitis B virus. In response to a hypothetical question, Whorton opined, "You're saying if a person was in contact with sewage that contained viable hepatitis B virus and had breaks in the skin sufficient to allow the virus to enter the skin, is that person at risk to developing a disease? [¶] . . . I think if you can penetrate the skin and you have a sufficient dose, yes, you are at risk." In later questioning, Whorton conceded it is "probably medically probable" that a sewage worker, exposed to raw sewage via a cut on his hand and with no other known source of exposure, contracted hepatitis B from the contact with the sewage. But Whorton indicated causation is hypothetical in Rosas's case because there are no other reported cases of sewage workers contracting hepatitis B.

As to his ultimate opinion, Dr. Whorton concluded, "I accept Dr. Rishwain's diagnosis as the fact hepatitis B was the primary disease, PAN as the secondary complication of it. In my original report, I said with regards to which disease he had, I did not believe either was related to his occupation and I still believe that as [sic] true based on the data I've been able to find."

On April 7, 1992, the WCJ filed his opinion denying Rosas's claim for workers' compensation, relying on Dr. Whorton's opinion. Both Rosas and Boehm filed petitions for reconsideration, contending inter alia the WCJ's decision is not supported by substantial evidence. On June 29, 1992, the Board filed a split opinion denying reconsideration. The majority concluded that either Dr. Ogrod's or Dr. Whorton's report constitutes substantial evidence that it is not "reasonably medically probable" that Rosas contracted hepatitis B occupationally. The dissenting Board member argued the opinion of Rosas's physician, Dr. Gandara, was more persuasive because Dr. Ogrod's report was based on an inadequate medical history and Dr. Whorton's testimony undermines Whorton's ultimate opinion.

Rosas and Boehm timely filed petitions for writ of review on August 13, 1992.[2] On December 30, 1992, we issued a writ of review in the consolidated cases.

## II

The applicant in a workers' compensation proceeding has the burden of proving industrial causation by a "reasonable probability." (*McAllister* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 408, 413 [71 Cal.Rptr.

---

[2]Apparently due to miscommunication, Boehm filed its petition in the Court of Appeal, First District. That court requested and obtained an order from the California Supreme Court on October 15, 1992, transferring the Boehm petition to this court.

697, 445 P.2d 313].) That burden manifestly does not require the applicant to prove causation by scientific certainty. In *McAllister*, the applicant, widow of a firefighter who died of lung cancer, presented evidence the decedent had inhaled smoke during his 32 years of employment, had suffered coughing spells and had complained about the smoke; a doctor testified the Board could "reasonably assume" the inhaled fire smoke had killed the decedent. The employer offered no evidence, arguing among other things the applicant had not presented "a satisfactory and detailed showing of the manner in which smoke inhalation may cause lung cancer." (*Id.* at pp. 411-412.)

The *McAllister* court annulled the Board's decision denying benefits, holding the medical testimony that causation was "reasonable" or "probable," i.e., more than merely possible, was sufficient to meet the burden of proof. (69 Cal.2d at pp. 416, 419.) "Future scientific developments will tell us more about lung cancer. Ultimately it may be possible to pinpoint with certainty the cause of each case of the disease. But the Legislature did not contemplate years of *damnum absque injuria* pending such scientific certainty. Accordingly, we and the [Board] are bound to uphold a claim in which the proof of industrial causation is reasonably probable, although not certain or 'convincing.' We must do so even though the exact causal mechanism is unclear or even unknown." (*Id.* at p. 419.) The question in the instant case is whether "substantial evidence supports a finding that there is not a reasonable probability that decedent's illness arose out of his employment." (See *ibid.*)

█ "[J]udicial review of decisions of the [Board] on factual matters is limited to determining whether the decision, based on the entire record, is supported by substantial evidence ([Lab. Code] § 5952, subd. (d); *LeVesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432])." (*Southern California Rapid Transit Dist., Inc. v. Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 158, 162 [151 Cal.Rptr. 666, 588 P.2d 806].) This standard is not met "by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." (*Garza v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451].)

"*LeVesque* (1 Cal.3d, pp. 635-637) specifically rejected earlier judicial declarations that an award of the [B]oard must be sustained, if supported by 'any evidence' [citations], or 'any substantial evidence' [citations]. Although such a rule may continue in other fields of our law, in workmen's compensation cases a reviewing court is no longer mandated to inquire only 'whether there is substantial evidence in favor of the respondent'; and then if such be found, 'no matter how slight it may appear in comparison with the contradictory evidence,' be bound to affirm the decision under review.

[Citations.] . . . [¶] It will be seen that under *LeVesque* our function in workmen's compensation cases is to consider the weight or persuasiveness of all of the evidence, as contrasted with that tending to support the [B]oard's decision. For unless we do so we have not reviewed the 'entire record to determine whether the board's conclusion was supported by substantial evidence.' But on the other hand, by mandate of Labor Code section 5952, we may not exercise our 'independent judgment on the evidence.' " (*Hulbert* v. *Workmen's Comp. Appeals Bd.* (1975) 47 Cal.App.3d 634, 638-639 [121 Cal.Rptr. 239], italics deleted.)

"[T]he relevant and considered opinion of one physician, though inconsistent with other medical opinions, normally constitutes substantial evidence. [Citations.] Medical reports and opinions are not, however, substantial evidence if they are based on surmise, speculation, or conjecture, or if they are known to be erroneous or based on inadequate medical histories and examinations. [Citations.]" (*Patterson* v. *Workers' Comp. Appeals Bd.* (1975) 53 Cal.App.3d 916, 921 [126 Cal.Rptr. 182].)

"[A] physician's opinion based upon a misunderstanding of applicable legal standards or the relevant facts cannot constitute substantial evidence to support the Board's determination. [Citations.] [¶] Moreover, when the Board relies upon the opinion of a particular physician in making its determination, it may not isolate a fragmentary portion of his report or testimony and disregard other portions that contradict or nullify the portion relied on; it must give fair consideration to all of his findings. [Citations.]" (*City of Santa Ana* v. *Workers' Comp. Appeals Bd.* (1982) 128 Cal.App.3d 212, 219 [180 Cal.Rptr. 125].)

## III

██ The Board relied on the opinions of Drs. Ogrod and Whorton in denying reconsideration. But, Dr. Ogrod's opinion was based in part on an inadequate medical history and a misunderstanding of the facts. Moreover, the Board disregarded those portions of Dr. Whorton's testimony which contradict his opinion. Ultimately, Dr. Ogrod's and Dr. Whorton's conclusions rest solely on the lack of reported cases of waste water treatment workers contracting hepatitis B, thus impermissibly requiring Rosas to prove causation by medical certainty. Because what remains in this case is the unrebutted medical opinion of Dr. Gandara, buttressed by the specific findings of Dr. Whorton, we shall conclude that no substantial evidence supports a finding that Rosas did not meet his burden of proving causation by a reasonable probability.

## A. *Rosas Developed PAN as a Complication of Hepatitis B.*

Dr. Ogrod expressed the opinion that Rosas developed PAN independently from his employment. Ogrod believed a hepatitis B core antigen IgM blood test had not been conducted in October 1987 and accordingly it could not be determined whether Rosas had recently contracted hepatitis B or rather was a carrier of hepatitis B, which would explain the presence of the hepatitis B surface antigen in Rosas's blood. Ogrod's conclusion that Rosas's PAN was not caused by his hepatitis B was based in part on Ogrod's belief that Rosas was a chronic carrier of hepatitis B.

Dr. Ogrod's opinion was based either on an inadequate medical history or a misunderstanding of the facts. As Dr. Rishwain explained, Rishwain did conduct a hepatitis B core antigen IgM blood test in October 1987, and the positive results of the test established that Rosas contracted acute hepatitis B during the six-month period prior to September 1987, which supported the diagnosis of PAN as a complication of hepatitis. Ogrod's examination of Rosas and Rosas's medical records occurred more than two years after Rishwain's examination. Ogrod either misread the medical records or for some reason did not obtain access to the relevant records. In either event, Ogrod's opinion was erroneous and fails to provide substantial evidence to support the Board's decision.

In his initial report to the WCJ, Dr. Whorton, too, opined that Rosas's medical problems were best explained by a diagnosis of PAN with accompanying hepatitis B antigenicity, unrelated to Rosas's employment. But at the outset of his second deposition, Whorton conceded he had reviewed Rishwain's deposition and accepted Rishwain's opinion that Rosas developed PAN as a complication of his hepatitis B. Thus, the uncontradicted evidence establishes that Rosas's PAN was a complication of his hepatitis B. The remaining question is whether substantial evidence shows it is not reasonably probable Rosas developed hepatitis B from occupational exposure to raw sewage.

## B. *Rosas Developed Hepatitis B Occupationally.*

Dr. Ogrod's conclusion that Rosas's hepatitis was not caused by his occupational exposure to sewage rested in part on Ogrod's medical history of Rosas, in which Ogrod summarized Rosas's sewage exposure as minimal, involving one episode in early September 1987 when raw sewage splashed in Rosas's face. Ogrod explained that the hepatitis B had been present for several weeks before Rosas developed symptoms, so the sewage exposure in September 1987 could not have been responsible for the disease. Even if we

indulge the presumption that Rosas may have provided Ogrod with this abbreviated history of his exposure to raw sewage, there is no explanation why Ogrod overlooked the more detailed histories of frequent and multiple sewage exposures over a long period of time set out in the medical reports of Drs. Gandara and Rishwain, which Ogrod claimed to have reviewed. To the extent Ogrod's opinion was based on his medical history of Rosas regarding sewage exposure, the opinion fails to support the Board's decision.

Dr. Ogrod further based his opinion that there was no occupational causation on the lack of literature reporting the transmission of the hepatitis B virus in "occupational activities of this nature" in this country. As we shall explain, ultimately Dr. Whorton's opinion is based on the same lack of literature reporting the occupational transmission of the hepatitis B virus to sewage workers.

Dr. Whorton's conclusion that Rosas's hepatitis B was not occupationally caused rested on his understanding that in 50 percent of the cases the etiology of hepatitis B is unknown and, further, that neither CDC nor the author of an article about health risks for sewage treatment workers have reported cases of sewage treatment workers contracting hepatitis B. However, Whorton's testimony on cross-examination revealed that his opinion was not influenced by the lack of known etiology in 50 percent of the cases and, more importantly, that at least hypothetically Whorton agreed that exposure to raw sewage probably can cause hepatitis B. Thus, Whorton testified the hepatitis B virus can survive minutes or hours in blood and other bodily fluids, such as urine and semen, after the fluids enter the sewer system as raw sewage. Furthermore, Rosas worked in sewer substations in close proximity to the sources of sewage. In response to a hypothetical question, Whorton agreed that a sewage worker exposed to raw sewage via a cut on his hand and with no other known source of exposure "probably medically probably" contracted hepatitis B from the sewage exposure. This hypothetical, of course, exactly matches Rosas's circumstances.

In Whorton's first deposition, he testified that if he thought sewage workers came into contact with blood or blood-contaminated fluids, he would change his opinion to conclude it was more likely than not that Rosas contracted hepatitis B from sewage. Yet, despite Whorton's concessions in his second deposition that the hepatitis B virus remains viable for some time in raw sewage and that, hypothetically, a sewage worker could contract hepatitis B from his exposure to raw sewage, Whorton did not change his opinion. At the close of his second deposition, Whorton made clear that he held to his original opinion only because of the lack of reported cases of sewage treatment workers contracting hepatitis B.

 Drs. Ogrod and Whorton staked their opinions regarding causation to the lack of prior reporting on the transfer of the hepatitis B virus, i.e., on the lack of scientific verification of the mode of transmission. Their insistence on scientific verification transformed the burden of proof from reasonable probability to scientific certainty, in violation of the California Supreme Court's opinion in *McAllister* v. *Workmen's Comp. App. Bd., supra*, 69 Cal.2d 408. To paraphrase *McAllister*, future scientific developments will tell us more about hepatitis B. Ultimately, it may be possible to pinpoint with certainty the cause of each case of the disease. We and the Board are bound to uphold a claim in which the proof of industrial causation is reasonably probable, although not certain or convincing. We must do so even though the exact causal mechanism is unclear or even unknown.

For the reasons stated, we conclude substantial evidence does not support the Board's conclusion that Rosas's occupational exposure to raw sewage did not cause his hepatitis B and PAN.

IV

The decision of the Board after reconsideration is annulled and the cause remanded for further proceedings consistent with the views expressed herein.

Blease, J., and Nicholson, J., concurred.